IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | | |
|---|---|---|
| IN RE TRIANGLE CAPITAL CORP. | ) | |
| SECURITIES LITIGATION | ) | |
| | ) | CONSOLIDATED CIVIL ACTION |
| This Document Relates to: | ) | Master File No. 5:18-CV-10-FL |
| | ) | |
| ALL ACTIONS | ) | |

## ORDER

These consolidated cases involving violations of federal securities laws come now before the court on defendants' motion to dismiss plaintiffs' amended consolidated complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) (DE 76). Lead plaintiff LifeWise Family Financial Security, Inc. ("LifeWise") filed its response in opposition to the motion, and defendants replied. In this posture, the issues presented are ripe for ruling. For the reasons that follow, defendants' motion is granted.

## STATEMENT OF THE CASE

Plaintiffs commenced the instant actions on November 21, 2017 and November 28, 2017,, respectively, alleging defendants violated of Securities Exchange Act of 1934 ("Exchange Act"), §§ 10(b) and 20(a), and applicable regulations by making fraudulent misrepresentations and omissions to investors in defendant Triangle Capital Corporation ("Triangle"). Plaintiffs seek to certify a class action on behalf of all purchasers of defendant Triangle's common stock, and seek damages, costs, attorney's fees, and other relief.

On January 12, 2018, the United States District Court for the Southern District of New York transferred Holden v. Triangle Capital Corporation and Koeppel v. Triangle Capital Corporation[1] to this district. On March 5, 2018, this court granted plaintiff LifeWise's motion to consolidate Holden and Koeppel. On March 12, 2018, the court ordered that plaintiff LifeWise be appointed lead plaintiff in the consolidated cases, appointed counsel for lead plaintiff, designated the consolidated cases as In re Triangle Capital Corp. Securities Litigation, Master File No. 5:18-CV-10, and directed lead counsel to file and serve a consolidated amended complaint.

On April 10, 2018, plaintiff Lifewise served a consolidated amended complaint against defendants Triangle Capital, Garland S. Tucker, III ("Tucker"), Steven C. Lilly ("Lilly"), and E. Ashton Poole ("Poole"), together with an exhibit listing alleged false or misleading statements (DE 69-1). On May 25, 2018, defendants filed the instant motion to dismiss for failure to state a claim. Defendants argue that plaintiffs fail to plead an actionable misstatement or omission, plaintiffs fail to plead falsity with particularity, and plaintiffs have failed to allege facts which raise a strong inference of scienter. In support of the motion, defendants rely upon a supporting declaration and several exhibits, including transcripts of investor calls and investor presentations, press releases, and Forms 10-K and 10-Q. Reference is made to defendants' index of exhibits submitted for the court's consideration, lodged on the docket at (DE 78-1),[2] for a complete listing of exhibits.

Lead plaintiff LifeWise responded in opposition to the motion. Lead plaintiff LifeWise argues that the complaint alleges several different types of false material misstatements and

---

[1]Koeppel was initiated by Elias Dagher, who was voluntarily dismissed from the action on May 29, 2018.

[2]For citations to documents identified by docket entry (DE) numbers, page numbers provided are those corresponding to the page numbers specified in the court's electronic case filing (ECF) system and not the page number provided, if any, on the face of the document.

omissions by defendants that are actionable, and that the complaint adequately alleges scienter. Defendants replied by arguing plaintiffs mischaracterized their own allegations, and reasserted prior arguments regarding the absence of a material act or omission, falsity, or scienter on the face of plaintiffs' complaint.

## STATEMENT OF THE FACTS

The facts alleged in the complaint[3] may be summarized as follows. Defendant Triangle is a publicly traded business development company ("BDC") which provides mezzanine finance to private businesses with annual revenues between $10 million and $250 million. (Compl. ¶¶ 2, 16). Defendant Poole is defendant Triangle's president, Chief Executive Officer ("CEO"), and Chairman of the Board of Directors ("Board"), and previously served as president and Chief Operating Officer ("COO"). (Id. ¶ 17). Defendant Lilly is defendant Triangle's Chief Financial Officer ("CFO") and a member of the Board. (Id. ¶ 18). Defendant Tucker is a member of the Board, and served as defendant Triangle's CEO until February 2016 and Chairman of the Board until May 2017. (Id. ¶ 19). Lead plaintiff LifeWise is a financing and investment company which purchased defendant Triangle's common stock during the proposed class period. (Id. ¶ 15). Plaintiff Lifewise seeks to certify a class action for all persons or entities who purchased or otherwise acquired defendant Triangle securities between May 7, 2014, and November 1, 2017. (Id. ¶ 1).[4]

A.    Background

Mezzanine financing is a hybrid of debt and equity financing that provides the lender with

---

[3] Hereinafter, all references to the "complaint" in the text and to "Compl." in citations are to the consolidated amended complaint filed April 10, 2018, (DE 69), unless otherwise specified.

[4]Plaintiff seeks to except from this class defendants, the officers and directors of the company at all relevant times, and members of the family of any previously named individuals. (See Compl. ¶ 135).

the ability to convert their financing to an ownership or equity interest in the borrowing company in the case of default. (Id. ¶ 22). In its 2014 Form 10-K filed with the SEC on March 2, 2015, defendant Triangle represented that it invests primarily in subordinated debt securities secured by second lien security interests in portfolio company assets, coupled with equity interests. (Id. ¶ 25; 2014 Form 10-K (DE 78-11) at 4).[5] Defendant Triangle further represented that such investments "would be rated below investment grade if they were rated. Such below investment grade securities are often referred to as 'high yield' or 'junk.'" (2014 Form 10-K (DE 78-11) at 4). Defendant Triangle's 10-K identifies numerous risk factors related to the business, such as "[f]inancial results might be affected adversely if one or more of our portfolio investments defaults on its loans or fails to perform as we expect," "we are dependent upon our executives for our future success," and "investing in our securities may involve an above average degree of risk." (2014 Form 10-K (DE 78-11) at 16, 28, 31).[6]

By approximately 2014, the mezzanine finance market began to experience some erosion due to the emergence of "unitranche" lending. (Compl. ¶ 26). Unitranche lending provided a hybrid security combining senior and subordinated debt in to one package with a blended rate and less risk. (See id.). This hybrid investment put pressure on the mezzanine finance market because it allowed borrowers to obtain financing at a single, blended rate between senior loans and junior mezzanine debt. (Id.). In addition, private equity firms began to compete to provide equity financing to firms that would traditionally utilize mezzanine financing. (Id. ¶ 27). Plaintiffs allege, based on comments

---

[5]In considering a motion to dismiss under Rule 12(b)(6), the court may consider extrinsic documents where "the document is integral to and explicitly relied on in the complaint, and when the plaintiffs do not challenge [the document's authenticity. Zak v. Chelsea Therapeutics Int'l, Ltd., 780 F.3d 597, 606–07 (4th Cir. 2015) (internal citations omitted).

[6]Defendant Triangle disclosed similar risk factors in its 10-K for 2015. (See 2015 10-K (DE 78-23) at 14-36; Compl. ¶¶ 66-68).

made by defendant Poole in November 2017, that at some point between early 2013 and the beginning of 2016, defendant Triangle's "investment professionals were aware of these changes and recommended to our former CEO to begin moving away from mezzanine structures and into lower-yielding but more secure second lien unitranche and senior structures." (See id. ¶¶ 28, 37). Defendant Poole stated the investment professionals reasoned that "[c]ompanies in our target market were gaining access to additional forms of capital on terms more favorable than what they could have achieved in the past. And as a result, the traditional risk-reward equation from mezzanine debt did not appear as attractive as it previously had." (Id.).

Plaintiffs allege that defendants misled the market with respect to the quality of the underwriting and investment controls and the quality of its 2014 and 2015 investments in order to continue to chase high end yields with lesser quality opportunities. (Id. ¶ 29). Several of defendant Triangle's 2014 and 2015 investments were placed on "non-accrual" at the close of the class period, effectively acknowledging that those assets were unlikely to generate future returns. (See id. ¶¶ 30-31). These investments constituted approximately 20% of defendant Triangle's investment portfolio from 2014 and 2015, 13.4% of defendant Triangle's total investment portfolio at cost, and 4.7% of defendant Triangle's total investment portfolio at fair value. (Id. ¶ 8).

B.    Defendant Triangle Pursues Mezzanine Financing Under its Established Structure

On May 7, 2014, defendant Triangle issued a press release and Form 10-Q announcing financial results for the first quarter of 2014, and defendant Tucker stated in the press release "we believe the lower middle market is poised to provide attractive investment opportunities during the balance of 2014." (Id. ¶¶ 32, 33; 2014 Q1 Press Release (DE 78-4) at 7; 2014 Q1 Form 10-Q (DE 78-3)). On May 8, 2014, in an earnings call with analysts and investors, defendant Poole stated that

defendant Triangle was "focusing on quality over quantity in terms of its investment pace per quarter," and that defendant Triangle was being "discriminate in how it is reviewing opportunities and choosing to invest." (Compl. ¶ 34; 2014 Q1 Earnings Call (DE 78-5) at 4, 9). Defendant Poole elaborated that defendant Triangle was passing on "B deals" so it could focus on "A deals," and that defendant Triangle's investment strategy was "a great way to continue to prudently invest the liquidity that we have - had over the last year and the firepower that we've reserved for more fruitful investing environment, which we believe is clearly unfolding." (Compl. ¶ 34; 2014 Q1 Earnings Call (DE 78-5) at 9, 11). Defendant Lilly also spoke on the call, stating "[t]he primary keys to a successful long-term track record in the BDC industry are to maintain one's credit focus, remain conservative and consistently apply an underwriting formula that produces solid results." (Compl. ¶ 35; 2014 Q1 Earnings Call (DE 78-5) at 4).

On August 6, 2014, defendant Triangle issued a press release and filed its Form 10-Q to announce its financial results for the second quarter of 2014, and defendant Tucker stated in the press release that "the second quarter of 2014 was robust on all fronts . . . [a]gain it is an exciting time for Triangle and it gives me great pleasure to be able to share such good news with our investors." (Compl. ¶ 38; 2014 Q2 Form 10-Q (DE 78-6)). On August 7, 2014, defendant Triangle held an earnings call with analysts and investors, where defendant Lilly stated that "we have taken advantage of what we perceived to be high-quality investment opportunities at attractive price points." (Compl. ¶ 39; 2014 Q2 Earnings Call (DE 78-7) at 4).

On November 5, 2014, defendant Triangle issued a press release and filed its Form 10-Q announcing the company's financial results for the third quarter of 2014. (Compl. ¶ 41; 2014 Q3 Press Release (DE 78-9) at 7; 2014 Q3 Form 10-Q (DE 78-8)). On November 6, 2014, defendant

Triangle held its quarterly earnings call. (Compl. ¶ 42; 2014 Q3 Earnings Call (DE 78-10)). In that call, defendant Tucker stated "[w]e are pleased that the origination portion of our business is operating so well. Our investment pipeline has been robust all year . . . ." (Compl. ¶ 42; 2014 Q3 Earnings Call (DE 78-10) at 3). Defendant Poole also stated that, with respect to the amount of opportunities coming in the door and the opportunities that defendant Triangle chose to pursue, "I can safely say that our pipeline is healthy." (Compl. ¶ 42; 2014 Q3 Earnings Call (DE 78-10) at 8).

On March 2, 2015, defendant Triangle issued a press release and filed its Form 10-K, announcing financial results for the fourth quarter and full year of 2014. (Compl. ¶¶ 44, 46; 2014 Q4 Press Release (DE 78-12); 2014 Form 10-K (DE 78-11)). In the press release, defendant Tucker stated that the fourth quarter represented a "strong end of the year" and stated that defendant Triangle was "pleased with the quality of our investment portfolio, the strength of our balance sheet, and the opportunities we see across the lower middle market." (Compl. ¶ 45; 2014 Q4 Press Release (DE 78-12) at 7). Defendant Triangle's Form 10-K represented that "the financing market for lower middle market companies" was "underserved, providing [the Company] with greater investment opportunities." (Compl. ¶ 46; 2014 Form 10-K (DE 78-11)). That same day, defendant Triangle hosted an earnings call with analysts and investors, reviewing financial results for the fourth quarter and end of year 2014. (Compl. ¶ 48; 2014 Q4 Earnings Call (DE 78-13)). Defendants emphasized the quality of their investments and review process. (Compl. ¶ 48; 2014 Q4 Earnings Call (DE 78-13)). At one point, defendant Poole specifically stated "we will continue to remain focused on quality versus quantity in terms of new investment activity." (Compl. ¶ 49; 2014 Q4 Earnings Call (DE 78-13) at 5).

The 2014 Form 10-K also detailed defendant Triangle's investment process, explaining that

for underwriting and approval, the defendant Triangle's investment committee would obtain due diligence from the underwriting team, request additional due diligence if necessary, and "approve the proposed investment by affirmative vote from a majority of the investment committee members" before proceeding with any investment. (See Compl. ¶¶ 46, 47; 2014 Form 10-K (DE 78-11) at 7-10).

On May 6, 2015, defendant Triangle issued a press release and filed its Form 10-Q, announcing its financial results for the first quarter of 2015. (Compl. ¶ 51; 2015 Q1 Press Release (DE 78-15); 2015 Q1 Form 10-Q (DE 78-14)). In the press release, defendant Tucker stated "[w]e remain confident in both the overall quality of our investment portfolio and the investment opportunities in the lower middle market for the remainder of 2015." (Compl. ¶ 51; 2015 Q1 Press Release (DE 78-15) at 8). On May 7, 2015, defendant Triangle held its quarterly earnings call. (Compl. ¶ 52; 2015 Q1 Earnings Call (DE 78-16)). Defendant Poole stated that he and management felt "very good" about defendant Triangle's new investments, and defendant Lilly stated "quality over quantity . . . . that's what we try to focus on and always have and I think that would be most – biggest guide post as we move forward." (Compl. ¶ 52; 2015 Q1 Earnings Call (DE 78-16) at 11).

On August 5, 2015, defendant Triangle issued a press release and filed its Form 10-Q for the second quarter of 2015. (Compl. ¶ 54; 2015 Q2 Press Release (DE 78-18); 2015 Q2 Form 10-Q (DE 78-17)). On August 6, 2017, defendant Triangle held its quarterly earnings call. (Compl. ¶ 55; 2015 Q2 Earnings Call (DE 78-19)). Defendant Tucker stated "we believe a steady unwavering focus on appropriate risk adjusted returns is the best method of producing above average, long term results." (Compl. ¶ 55; 2015 Q2 Earnings Call (DE 78-19) at 3). Defendant Lilly also said "we're trying to find the best risk adjusted returns we can." (Compl. ¶ 55; Q2 Earnings Call (DE 78-19) at 10).

On November 4, 2015, defendant Triangle issued a press release and filed its Form 10-Q for the third quarter of 2015. (Compl. ¶¶ 57, 58; 2015 Q3 Press Release (DE 78-21); 2015 Q1 Form 10-Q (DE 78-20)). In the press release, defendant Tucker stated "we were able to originate a record level of new investments in high quality companies during the quarter" and that defendant Triangle was able to "take advantage of what we perceive to be an opportune time in the investing market." (Compl. ¶ 58; 2015 Q3 Press Release (DE 78-21) at 6). On November 5, 2015, defendant Triangle hosted its quarterly earnings call. (Compl. ¶ 59; 2015 Q3 Earnings Call (DE 78-22)). Defendants emphasized the robustness of defendant Triangle's underwriting procedures, with defendant Tucker stating "I believe Triangle has successfully navigated this rough [p]atch with the same measure of discipline and focus . . . ." (See Compl. ¶ 59; 2015 Q3 Earnings Call (DE 78-22) at 5). Defendant Lilly also stated "we feel very good about [the current originations]" and "there is a lot of filter and it goes on." (Compl. ¶ 59; 2015 Q3 Earnings Call (DE 78-22) at 11). Defendant Poole also stated on the call that, based on "our credit discipline and maintaining our focus," defendant Triangle would be "in a position to achieve in what we believe is a very opportunistic time in the market." (Compl. ¶ 59; 2015 Q3 Earnings Call (DE 78-22) at 3).

D. Defendant Triangle Changes Leadership and Reorganizes

On February 3, 2016, defendant Triangle announced that defendant Poole would take over as CEO, while defendant Tucker would continue to serve as Chairman of the Board. (Compl. ¶ 62). Following defendant Poole becoming CEO, defendant Triangle implemental a new operational plan, called TCAP 2.0, which it claimed would promote open communication, cross-functional alignment, and increased accountability. (Id. ¶ 63). Plaintiffs allege that this regime changed the investment committee to require approval for deals from the COO, Chief Accounting Officer ("CAO"), and

Chief Compliance Officer ("CCO"), while sole approval and rejection power previously resided with the CEO. (Id. ¶ 64). TCAP 2.0 also required beginning to shift focus away from riskier, higher-yield investments and place further emphasis on unitranche investing. (Id. ¶ 65).

On February 24, 2016, defendant Triangle issued a press release and filed its Form 10-K, announcing financial results for the fourth quarter and full year of 2015. (Id. ¶¶ 66, 68; 2015 Q4 Press Release (DE 79-1); 2015 Form 10-K (DE 78-23)). In the press release, defendant Poole stated "[w]e are pleased to report a strong finish to 2015 . . . . As we move into 2016, we believe our investing platform is well positioned to continue capitalizing on the attractive opportunities the lower middle market provide[]s." (Compl. ¶ 67; 2015 Q4 Press Release (DE 79-1) at 7). The 2015 Form 10-K also detailed defendant Triangle's investment process, portfolio management and investment monitoring processes. (See Compl. ¶ 68; 2015 Form 10-K (DE 78-23) at 7-10). Defendant Triangle's 2015 Form 10-K also described the company's internal process for rating investments. (Compl. ¶ 69; 2015 Form 10-K (DE 78-23) at 10-11). On February 25, 2016, defendant Triangle held its quarterly earnings call to discuss financial results for the fourth quarter of 2015, as well as give a year end review of 2015. (See Compl. ¶ 70; 2015 Q4 Earnings Call (DE 79-2)). On the call, defendant Poole stated "we excelled in originating high-quality new investments in the lower-middle market." (Compl. ¶ 70; 2015 Q4 Earnings Call (DE 79-2) at 3).

On May 4, 2016, defendant Triangle issued a press release and filed its Form 10-Q, announcing financial results for the first quarter of 2016. (Compl. ¶ 72; 2016 Q1 Form 10-Q (DE 79-3). On May 5, 2016, defendant Triangle hosted its quarterly earnings call. (Compl. ¶ 73). On the call, defendant Poole stated that yield compressions impacted defendant Triangle's "market pricing and the weighted average yield of our investment portfolio." (Id.). Defendant Poole stated

that the market was bifurcated, stating "the higher spreads . . . aren't happening with the A deals, the A companies. They are happening with the B and C companies." (Id.). Defendant Poole then stated "[B and C deals] may have a whole host of risk profiles that are different than what you see in the A deals." Id.

On July 29, 2016, defendant Triangle issued a press release announcing that it closed an underwritten public officer of common stock, which netted approximately $119.6 million in proceeds. (Id. ¶ 76). According to the press release, defendant Triangle intended to use the net proceeds of the public offering to make additional investments. (Id.).

On August 3, 2016, defendant Triangle issued a press release and filed its Form 10-Q, announcing its financial results for the second quarter of 2016. (Id. ¶ 77; 2016 Q2 Form 10-Q (DE 79-5)). On August 4, 2016, defendant Triangle held its quarterly earnings call. (Compl. ¶ 78; 2016 Q2 Earnings Call (DE 79-6)). During the call, defendant Poole stated "the pipeline that we have is healthy. It represents a good mix of mezzanine and unitranche opportunities." (Compl. ¶ 79; 2016 Q2 Earnings Call (DE 79-6) at 6).

On October 18, 2016, defendant Triangle announced that Brent P.W. Burgess ("Burgess") was resigning from his positions as Chief Investment Officer ("CIO") and director. (Compl. ¶ 80). On November 2, 2016, defendant Triangle issued a press release and filed its Form 10-Q, announcing financial results for the third quarter of 2016. (Id. ¶ 81; 2016 Q3 Form 10-Q (DE 79-7)). On November 3, 2016, defendant Triangle held its quarterly earnings call. (Compl. ¶ 82; 2016 Q3 Earnings Call (DE 79-8)). Defendant Lilly stated "we had a very healthy investment pipeline in the second half of the year, which result in our desire to raise growth equity capital to fund in to that pipeline." (Compl. ¶ 82; 2016 Q3 Earnings Call (DE 79-8) at 8). When asked by an analyst whether

the company's current structure could have avoided issues under the prior organization, defendant Poole stated the structure prior to TCAP 2.0 "might have had elements" that "in some cases might have influenced decisions that ultimately came back to bite us." (Compl. ¶ 83; 2016 Q3 Earnings Call (DE 79-8) at 12). Defendant Poole elaborated, saying "maybe there were fewer checks and balances in the investment process at the time" and that he tried to implement "a more fulsome upfront, check and balance process that will hopefully on the margin continue to tighten up that underwriting process and improve investment results." (Compl. ¶ 83; 2016 Q3 Earnings Call (DE 79-8) at 12).

On February 22, 2017, defendant Triangle issued a press release and filed its Form 10-K, announcing financial results for the fourth quarter and full year of 2016. (Compl. ¶¶ 85, 86; 2016 Form 10-K (DE 79-9)). The 2016 Form 10-K also detailed defendant Triangle's investment process, portfolio management and investment monitoring processes. (Compl. ¶ 86; 2016 Form 10-K (DE 79-9) at 7-9). Defendant Triangle's 2016 Form 10-K also described the company's internal process for rating investments. (Compl. ¶ 87; 2016 Form 10-K (DE 79-9) at 10). On February 23, 2017, defendant Triangle held its quarterly earnings call to discuss financial results for the fourth quarter of 2016. (Compl. ¶ 89; 2016 Q4 Earnings Call (DE 79-10)). Defendant Poole, commenting on the new structure for underwriting and risk assessment, stated that he put in place "multiple points of what I would call veto authority for transactions, wether in the original inception mode, in contemplation mode, all the way through documentation modes and ultimately through final approval modes." (Compl. ¶ 90; 2016 Q4 Earnings Call (DE 79-10) at 7). Defendant Poole elaborated, stating "at each point of the process, unlike before, certain individuals within the organization will have full veto rights on a transaction . . . ." (Compl. ¶ 90; 2016 Q4 Earnings Call

(DE 79-10) at 7).

On February 28, 2017, defendant Triangle raised approximately $132 million in equity growth capital. (Compl. ¶ 91). On May 1, 2017, defendant Triangle announced it amended its senior credit facility by $135 million to a total of $435 million, with a final maturity date of April 30, 2022. (Id.). In conjunction with the offering and credit facility, defendant Triangle amassed $272 million by and through certain defendants. (Id.).

On May 3, 2017, defendant Triangle issued a press release and filed its From 10-Q, announcing financial results for the first quarter of 2017. (Id. ¶ 92; 2017 Q1 Form 10-Q (DE 79-11)). On May 4, 2017, defendant Triangle held its quarterly earnings call. (Compl. ¶ 93). During the call, defendant Lilly compared the yield in 2013 and 2014 to the present, stating "if you look at that period of time and look at fair value within our book today, I think you would reasonably conclude that there was a period where Triangle was pacing yield more than it should have." (Id.). Defendant Lilly elaborated, stating "there were times where we were chasing yield as a company," but also stating "[i]t does not mean that every transaction was like that during that time period" and "it's dangerous to draw conclusions one way or the other about an entire v[i]ntage or an entire book." (Id. ¶ 94).

On June 22, 2017, defendant Triangle hosted its 8th Annual Analyst and Investor Meeting. (Id. ¶ 96). During the meeting, defendant Triangle made a presentation explaining how it had improved its business model. (Id.; 2017 Investor Meeting (DE 79-12)). Defendant Triangle identified several areas where it believed improvement had been required, including: (i) "For many years TCAP was small enough to operate with a 'partnership mentality'"; (ii) "Investment committee met and looked to CEO for 'approval' or 'rejection'"; (iii) "Fewer difficult questions coupled with

a lack of individual ownership and accountability"; and (iv) "No 'TCAP standard' on documentation items." (Compl. ¶ 96; 2017 Investor Meeting (DE 79-12) at 4, 6-7). Defendant Triangle represented that it had improved these areas by implementing changes, including: (i) "cross-functional veto rights"; (ii) "Investment committee meets and looks to COO, CAO and CCO for approval or rejection"; (iii) "More rigorous questions coupled with increased individual ownership and accountability"; (iv) "Decisions are based solely on 'protecting the firm'"; and (v) "Our operational changes have improved our investment results and created a culture of increased accountability." (Compl. ¶ 96; 2017 Investor Meeting (DE 79-12) at 5-7).

E.    Defendant Triangle's 2014 and 2015 Investment Vintages Falter

On August 2, 2017, defendant Triangle issued a press release announcing its financial results for the second quarter of 2017. (Compl. ¶ 98; 2017 Q2 Press Release (DE 79-13)). On August 3, 2017, defendant Triangle held its quarterly earnings call, were defendants were asked several questions by investors and analysts raising concerns about defendant Triangle's 2014 and 2015 investments. (Compl. ¶ 101; 2017 Q2 Earnings Call (DE 79-15)). During the call, defendant Lilly stated that it was likely that only two of the five portfolio companies carrying below 80% of cost would go on non-accrual in the next two to four quarters, and only one that carried above 80% of cost "might go in non-accrual" during the same timeframe. (Compl. ¶ 101; 2017 Q2 Earnings Call (DE 79-15) at 6). Defendant Poole added that defendant Triangle has recently improved its credit monitoring capabilities to identify trouble areas in its portfolio. (See Compl. ¶ 102; 2017 Q2 Earnings Call (DE 79-15) at 7). Later in the call, defendant Lilly stated that in 2014 and 2015, "there was a motive, if you will, to -- internally to try to maintain what at that time was the highest base per share dividend in the sector. And that's not a long-term strategy, that has proven for investors as one

14

of comfortably over earning for a long, sustained period of time and achieving that lower volatility." (Compl. ¶ 105; 2017 Q2 Earnings Call (DE 79-15) at 10).

On November 1, 2017, defendant Triangle issued a press release announcing its financial results for the third quarter of 2017. (Compl. ¶ 107; 2017 Q3 Press Release (DE 79-17)). In this announcement, defendant Triangle announced that it had placed seven new investments on non-accrual status during the quarter. (Compl. ¶ 107; 2017 Q3 Press Release (DE 79-17)). On November 2, 2017, defendant Triangle held its quarterly earnings call. (Compl. ¶ 108; 2017 Q3 Earnings Call (DE 79-18)). During the call, defendant Poole, reflecting on the failure of defendant Triangle's investment strategy, explained to analysts and investors that defendant Triangle's investment professionals had advised defendant Tucker to begin moving away from mezzanine structures and into lower-yielding but more secure second lien, unitranche, and senior structures. (Compl. ¶ 108; 2017 Q3 Earnings Call (DE 79-18) at 3-4). Defendant Poole then explained that defendant Triangle had adhered "to a majority-focused mezzanine investment strategy," and "in the process of doing so, we added incremental exposure to a number of riskier credits." (Compl. ¶ 108; 2017 Q3 Earnings Call (DE 79-18) at 3-4). Defendant Poole stated that "at this point we acknowledge that as a firm we are being held back primarily by our 2014 and 2015 investment vintages." (Compl. ¶ 108; 2017 Q3 Earnings Call (DE 79-18) at 3-4).

Regarding the origination process in 2014 and 2015, defendant Poole stated that "the origination teams were being directed to focus on the mezzanine opportunities. So, in some respect, the self selection at that point was an embedded credit decision." (Compl. ¶ 110; 2017 Q3 Earnings Call (DE 79-18) at 12).

Additional facts pertinent to the instant motion will be discussed below.

15

**DISCUSSION**

A.      Standard of Review

To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.   In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted).

Ordinarily, a plaintiff need only make "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).   However, Rule 9(b) creates an exception to this liberal pleading standard and requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "This heightened pleading requirement serves to protect defendants' reputations from baseless accusations, eliminate meritless suits brought only to extract a settlement, discourage fishing expeditions, and provide defendants with enough information about a plaintiff's allegations to mount a defense." Maguire Fin., LP v. PowerSecure Int'l, Inc., 876 F.3d 541, 546 (4th Cir. 2017) (citing Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP, 551 F.3d 305, 311 (4th Cir. 2009)).

"[T]he inconsistent application and interpretation of Rule 9(b) and other abuses in securities cases prompted Congress to enact the PSLRA [Private Securities Litigation Reform Act]." Maguire

Fin., 876 F.3d at 546 (quoting Teachers' Ret. Sys. of La. v. Hunter, 477 F.3d 162, 171 (4th Cir. 2007)).  Where plaintiff alleges defendant made an untrue material statement or omitted a material statement of fact that would be necessary to make a statement not misleading, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

B.    Analysis

Section 10(b) of the Exchange Act, makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Section 10(b) is implemented by Rule 10b-5, which makes it unlawful "[t]o employ any device, scheme or artifice to defraud[;] [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading, or[;] [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5. Section 10(b) provides an implied private right of action, and the plaintiff in such an action "must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  Stoneridge Inv. Partners v. Sci.-Atlanta, Inc., 552 U.S. 148, 157 (2008).

Section 20(a) of the Exchange Act imposes liability on "every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act]" . . . "to the same

17

extent as such controlled person" . . . "unless the controlling person acted in good faith and did not

directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C.

§ 78t(a). "Section 20(a) is the vehicle for imposing liability on control persons. The liability of a

control person under section 20(a) is derivative of—and dependent upon—liability of a controlled

person under section 10(b)." Singer v. Reali, 883 F.3d 425, 438 (4th Cir. 2018) (citing Yates v.

Mun. Mortg. & Equity, LLC, 744 F.3d 874, 894 n.8 (4th Cir. 2014)).

The first element necessary to state a claim under Rule 10b-5 is "a material misrepresentation

or omission by the defendant." Stoneridge Inv. Partners, 552 U.S. at 157. "To allege a false

statement or omission of material fact, plaintiffs must point to a factual statement or omission—that

is, one that is demonstrable as being true or false." Nolte v. Capital One Fin. Corp., 390 F.3d 311,

315 (4th Cir. 2004) (citing Longman v. Food Lion, Inc., 197 F.3d 675, 682 (4th Cir.1999). A

statement of opinion is only a false factual statement "if the statement is false, disbelieved by its

maker, and related to matters of fact which can be verified by objective evidence." Nolte, 390 F.3d

at 315. "[C]laims based on forward looking statements are barred if the statement is: (1) identified

as such and accompanied by meaningful cautionary language; (2) immaterial; or (3) not made with

actual knowledge of its falsity." 15 U.S.C. § 78u-5(c)(1). A "forward looking statement" includes

statements of

> (A) . . projection of revenues, income (including income loss), earnings (including
> earnings loss) per share, capital expenditures, dividends, capital structure, or other
> financial items; (B) . . . plans and objectives of management for future operations;
> (C) . . . future economic performance, including any such statement contained in a
> discussion and analysis of financial condition by the management . . .; and (D) . . .
> the assumptions underlying or relating to any statement described in subparagraph
> (A), (B), or (C).

Id. § 78u-5(i)(1); see also Gasner v. Bd. of Sup'rs of the Cty. of Dinwiddie, Va., 103 F.3d 351, 358

(4th Cir. 1996) ("This is the so-called 'bespeaks caution' doctrine relied upon by various courts in concluding that claims of securities fraud are subject to dismissal if cautionary language in the offering document negates the materiality of the alleged misrepresentations or omissions.").

In addition to establishing that a statement or omission is false, a statement or omission must be material in order to be actionable. A "fact stated or omitted is material if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." Singer, 883 F.3d at 440 (quoting U.S. S.E.C. v. Pirate Inv'r LLC, 580 F.3d 233, 240 (4th Cir. 2009)). "Where fraudulent projections are alleged, the plaintiff must therefore identify in the complaint with specificity some reason why the discrepancy between a company's optimistic projections and its subsequently disappointing results is attributable to fraud." Hillson Partners Ltd. P'ship v. Adage, Inc., 42 F.3d 204, 209 (4th Cir. 1994). "'Soft,' 'puffing' statements . . . generally lack materiality because the market price of a share is not inflated by vague statements predicting growth." Raab v. Gen. Physics Corp., 4 F.3d 286, 289 (4th Cir. 1993).

With this legal framework in mind, the court turns to the allegations set forth in the complaint. Lead plaintiff LifeWise alleges defendants engaged in four different types of material false statements and omissions: 1) defendants touted the quality of their investments, but failed to reveal that defendants were continuing to pursue mezzanine finance opportunities over the advice of their investment professionals; 2) defendants continuously emphasized the adequacy of defendant Triangle's origination practices, when defendants knew the company was chasing high-yield investments from lower-quality investment opportunities; 3) defendants represented the company's

investment committee was responsible for approving investments, but defendant Tucker was solely responsible for approval and veto of proposed investments; and 4) defendants did not properly disclose the true extent of the issues caused by defendant Triangles 2014 and 2015 investments until after necessary financing had been obtained. The court addresses each set of alleged false statements in turn.

      1.     Defendants Touting the Quality of Their Investments

Plaintiff LifeWise first contends that defendants made false factual statements and omissions by touting the quality of defendant Triangle's investments during 2014 and 2015, but failed to disclose that investment professionals had recommended defendant Triangle should shift away from mezzanine products to lower risk unitranche products that would offer a lower rate of return. (Pl. Resp. (DE 83) at 18; <u>see</u> Compl. ¶ 108; 2017 Q3 Earnings Call (DE 79-18) at 3-4)).

In 2014 and 2015, defendants made a variety of different statements expressing that they believed that they were making quality investments. (See, e.g., Compl. ¶¶ 32, 33, 34, 39, 45, 51, 67; 2014 Q1 Press Release (DE 78-4) at 7 ("[W]e believe the lower middle market is poised to provide attractive investment opportunities during the balance of 2014."); 2014 Q1 Earnings Call (DE 78-5) at 9, 11 ("So I think we are thinking about it as a great way to continue to prudently invest the liquidity that we have - had over the last year and the firepower that we've reserved for more fruitful investing environment, which be believe is clearly unfolding."); 2014 Q2 Earnings Call (DE 78-7) at 4 ("[W]e have taken advantage of what we perceived to be high-quality investment opportunities at attractive price points . . . . As a result, . . . , we are becoming increasingly convinced that 2014 could end up being one of TCAP's most active years in terms of new investments."); 2014 Q4 Press Release (DE 78-12) at 7) ("[W]e are pleased with the quality of our investment portfolio, the strength

of our balance sheet, and the opportunities we see across the lower middle market."); 2015 Q1 Press Release (DE 78-15) at 8 ("We remain confident in both the overall quality of our investment portfolio and the investment opportunities in the lower middle market for the remainder of 2015.")).

Most of these statements are forward looking and encompass discussions of defendant Triangle's operations, future economic performance, and the assumptions underlying each of these items. See 15 U.S.C. § 78u-5(i)(1). Where defendants did make such forward looking statements, they conspicuously provided cautionary language reminding investors that many of their forward looking statements might materially differ in terms of results, based on risk factors outlined in defendant Triangle's Forms 10-K and 10-Q, as well as other unknown risks. (See, e.g., 2014 Q2 Earnings Call (DE 78-7) at 1; 2015 Q1 Press Release (DE 78-15) at 11). These forms provided numerous disclosures regarding the risks of mezzanine financing, such as "[w]e operate in a highly competitive market for investment opportunities . . . " and identifying for investors the possibility that other companies might offer better pricing and more flexible structuring, ultimately requiring defendant Triangle to accept less favorable terms for mezzanine finance deals. (See, e.g., 2014 Form 10-K (DE 78-11) at 16). Thus, where defendants made forward looking statements expressing optimism and opportunity regarding future investment the mezzanine market, they are protected from liability by the safe harbor under the PSLRA.

Defendants remaining statements in 2014 and 2015 regarding the quality of the investments in those vintages are opinion statements. (See, e.g., Compl. ¶¶ 42, 59; 2014 Q3 Earnings Call (DE 78-10) at 3) ("Our investment pipeline has been robust all year and [we] remain very pleased with the quality of the new investments we've made."); 2015 Q3 Earnings Call (DE 78-22) at 11 ("In terms of how we felt, how we feel about current originations, I think the factor answer is we feel very

good about them, we wouldn't have made the investments to begin with . . . .").

In order for such opinions about the quality of investments to be actionable, the statements must be "false, disbelieved by its maker, and related to matters of fact which can be verified by objective evidence." Nolte, 390 F.3d at 315. While the complaint adequately alleges that the 2014 and 2015 investments did not turn out to be quality investments, (see Compl. ¶¶ 30-31), lead plaintiff Lifewise relies exclusively on defendant Poole's retrospective comments on November 2, 2017 to support its argument that defendants did not believe they were making quality investments when making their statements in 2014 and 2015, because some investment professionals at some point told defendant Tucker that defendant Triangle should move away from mezzanine financing toward unitranche lending. (Compl. ¶ 108; 2017 Q3 Earnings Call (DE 79-18) at 3-4).

Lead plaintiff LifeWise's reliance solely on defendant Poole's statements is insufficient to adequately plead that defendants disbelieved their statements that defendant Triangle's investments were quality investments. It is not clear from defendant Poole's statement who these investment professionals are, or when these recommendations were made. (See Compl. ¶ 108; 2017 Q3 Earnings Call (DE 79-18) at 3-4). Such facts are necessary to plead fraud in a securities case. See 15 U.S.C. § 78u-4(b)(1); Fed. R. Civ. P. 9(b). In the absence of such facts, it is impossible to plausibly show what defendants believed or disbelieved when making statements about the quality of the company's investments, in turn making the complaint's allegations regarding the falsity of defendants' opinion statements deficient.[7]

---

[7]Such details are also critical for determining if the opinions of the alleged investment professionals would have been material. See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 135 S. Ct. 1318, 1329 (2015) ("Reasonable investors understand that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why an issuer may frame a statement as an opinion, thus conveying uncertainty.").

Even setting aside the obvious deficiency presented by plaintiffs' complaint, the pleadings as alleged do not plausibly show that defendants disbelieved that their investments were quality investments in relation to unitranche investments. For example, in the March 2, 2015 earnings call with investors, defendant Tucker stated that

> we continue to think that the sub-debt part of the balance sheet overall is the most attractive place to invest and Ashton mentioned a minute ago our involvement in unitranche deals and we certainly have done some of those and in those situations, we felt that we were better served from a total risk reward standpoint of moving up the balance sheet a bit.

(2014 Q4 Earnings Call (DE 79-13) at 15). Earlier in that same call, defendant Poole discussed how defendant Triangle had made additional unitranche deals during the fourth quarter of 2014. (2014 Q4 Earnings Call (DE 79-13) at 12). Defendants made similar comments on other earnings calls with investors, discussing defendant Triangle's investment strategy as between mezzanine and unitranche opportunities, and emphasizing that they believed it was important to secure the most attractive investment for stockholders.[8] (See, e.g., 2014 Q3 Earnings Call (DE 78-10) at 15 ("I'd say that in general the mezz market and the subordinate debt market has provided historically the greatest platform, the key platform for TCAP. But we remain open and willing to invest in unitranche opportunities, where we can find risk-adjusted returns that we think are commensurate with our shareholders."); 2015 Q1 Earnings Call (DE 78-16) at 12-13)).

Such comments acknowledge that, during 2014 and 2015, defendants had considered the mix of unitranche and mezzanine debt in its portfolio, determined that defendant Triangle's best investment approach was to undertake some unitranche deals but remain focused on mezzanine

---

[8]In addition, at defendant Triangle's 2017 Analyst and Investor Meeting, defendant Triangle presented data showing that defendant Triangle nearly doubled its 1st Lien Notes and Unitranche investments from the end of 2013 to the end of 2015. (2017 Investor Meeting (DE 79-12) at 14).

finance, and disclosed such strategy to its investors. The court cannot reasonably infer from defendants' comments, absent additional facts, that defendants disbelieved that they were making quality investments.

Consequently, plaintiffs fail to plead sufficient, particularized facts to plausibly show defendants' statements regarding the quality of defendant Triangle's investments were false.

2.      Defendants Emphasizing the Adequacy of Triangle's Origination Practices

Plaintiff LifeWise argues that defendants misrepresented the quality of defendant Triangle's origination practices, such as focusing on quality over quantity and growing its investment portfolio in a reasonable manner, when really defendants alleged knew that defendant Triangle was "chasing high-yield investments from lower quality investment opportunities." (Pl. Resp. (DE 83) at 18).

Defendants made several statements emphasizing that defendant Triangle focuses on quality of investments rather than quantity. (See, e.g., Compl. ¶¶ 34, 42, 48, 49, 52). For the reasons discussed above, plaintiff fails to plead sufficient facts to show such statements about the quality of investments were fraudulent at the time the statements were made.

Plaintiffs also seize on defendant Poole's initiation of TCAP 2.0 as an indication that defendants did not believe that their origination process was adequate before such changes. For example, defendant Poole stated on November 3, 2016 that "maybe there were fewer checks and balances in the investment process" in 2014 and 2015, and "so what I've tried to do is implement a more fulsome up front, check and balance process that will hopefully on the margin continue to tighten up that underwriting process and improve the investment results." (See, e.g., Compl. ¶ 83; 2016 Q3 Earnings Call (DE 79-8) at 12). On May 4, 2017, defendant Lilly stated "if you look at that period of time and look at fair value within our book today, I think you would reasonably conclude

that there was a period where Triangle was pacing yield more than it should have." (See Compl. ¶¶ 93, 94).

Defendants' statements in 2016 and 2017 regarding origination are driven by hindsight and fail to show that defendants believed their origination process was inadequate when making contemporaneous opinion statements about the quality of defendant Triangle's origination process for its 2014 and 2015 investment vintages. (See, e.g., id., ¶¶ 34, 35, 42, 48, 49, 55, 59, 60; 2014 Q1 Earnings Call (DE 78-5) at 4, 9 (". . . And so I think we've got[ten] more discriminate in how we are reviewing opportunities and choosing to invest."); 2014 Q3 Earnings Call (DE 78-10) at 8 ("I can safely say that our pipeline is healthy."); 2014 Q4 Earnings Call (DE 78-13) at 3, 5 ("Balancing against this robust level of inventory is our internal view that not every company meets our underwriting standards."); 2015 Q2 Earnings Call (DE 78-19) at 6, 10 ("[W]e're trying to find the best risk adjusted returns we can."); 2015 Q3 Earnings Call (DE 78-22) at 3, 5 ("I believe Triangle has successfully navigated this rough [p]atch with the same measure of discipline and focus that our team employed to navigate the successful days in quarters before.")).

Moreover, plaintiffs fail to plead sufficient facts to plausibly show a fraudulent omission regarding defendants' strategy to prioritize high yield investments. (See Compl. ¶¶ 93, 94). Defendant Triangle's business is predicated on investing in "high yield" investments, which was disclosed in defendant Triangle's Forms 10-K. (See 2014 Form 10-K (DE 78-11) at 3 ("We generally invest in securities that would be rated below investment grade if they were rated. Such below investment grade securities are often referred to as 'high yield' or 'junk.'"); 2015 Form 10-K (DE 78-23) at 3). Defendant Triangle explained its origination process to investors. (2014 Form 10-K (DE 78-11) at 5-13; 2015 Form 10-K (DE 78-23) at 5-13). Additionally, defendant Triangle also

detailed extensively the risks of pursuing such high yield investments for investors. (See 2014 Form 10-K (DE 78-11) at 14-35; 2015 Form 10-K (DE 78-23) at 14-36).

For these reasons, the complaint fails to plead with sufficient specificity facts that show defendants believed their origination process was inadequate when making contemporaneous statements about originating its 2014 and 2015 investments. Thus defendants cannot be said to have made a material false statement or omission as to its origination process in 2014 and 2015.

3.      Defendants Representing the Investment Committee Approves Investments

Plaintiff LifeWise's third alleged set of alleged misrepresentations stems from defendants' representations concerning the final approval of investments at defendant Triangle. Specifically, plaintiff LifeWise alleges that defendants represented that the investment committee had the responsibility for final approval or rejection of investments in their 2014 Form 10-K and other disclosures, but that in actual practice "[d]efendant Tucker was solely responsible for approval and veto of proposed investments." (Pl. Resp. (DE 83) at 18).

Defendant Triangle's Forms 10-K for 2014 and 2015[9] both represent that defendant Triangle's process for final approval of an investment required that the company "Present Investment Memorandum to the Investment Committee; Investment Committee Members Vote and Approve the Proposed Investment." (2014 Form 10-K (DE 78-11) at 7; 2015 Form 10-K (DE 78-23) at 7). The annual disclosure further states: "[b]efore we proceed with any investment, the investment committee must approve the proposed investment by the affirmative vote from a majority of the investment committee members." (2014 Form 10-K (DE 78-11) at 8; 2015 Form 10-K (DE 78-23)

_____

[9]The court focuses on disclosures for these years because defendant Tucker was CEO during this time, and the 2014 and 2015 investment vintages would have originated during these periods.

at 8).

The only specific mention in all of the complaint regarding defendant Tucker's relationship to the investment committee during his tenure as CEO was at the 8th Annual Analyst and Investor Meeting in 2017.  (See Compl. ¶ 96).  There, during a presentation, defendant Triangle presented a slideshow stating "[o]ur investment committee was chaired by our CEO and investments were approved by a simple majority vote."  (2017 Investor Meeting (DE 79-12) at 5).  The presentation also stated that the "[i]nvestment committee met and looked to CEO for 'approval' or 'rejection.'" (2017 Investor Meeting (DE 79-12) at 6).

Defendant Triangle's disclosures and presentations on the investment process are consistent that the investment committee approved investments by simple majority vote.  (2014 Form 10-K (DE 78-11) at 7, 8; 2015 Form 10-K (DE 78-23) at 7, 8; 2017 Investor Meeting (DE 79-12) at 5). Although defendant Triangle stated in its investor meeting presentation that defendant Tucker chaired the investment committee, and the committee "looked to [defendant Tucker] for 'approval' or 'rejection,'" those statements do not establish a reasonable inference that defendant Tucker had an absolute veto over the investment committee or could unilaterally approve investments without a majority vote of the committee.  (See 2017 Investor Meeting (DE 79-12) at 5, 6).  Moreover, defendant Triangle disclosed that one risk factor in their business was that it depended on senior management to select investments in their Forms 10-K for 2014 and 2015.  Investors were put on notice that defendant Triangle "depend[s] on the members of our senior management team . . . for the final selection, structuring, closing and monitoring of our investment."  (See 2014 Form 10-K (DE 78-11) at 16; 2015 Form 10-K (DE 78-23) at 16) (emphasis added).

For these reasons, plaintiff LifeWise has failed to plausibly show that defendant Triangle

made a false statement or omission regarding defendant Tucker's role in the final selection of investments by defendant Triangle's investment committee in 2014 and 2015.

4.      Defendants Not Disclosing Problems Until After Necessary Financing Obtained

Finally, plaintiff LifeWise argues that "[d]efendants did not properly disclose the true extent of the issues caused by Triangle's 2014 and 2015 investments, [and] their likelihood of nonaccrual . . . until after the necessary financing was obtained."[10]  (Pl. Resp. (DE 83) at 18).

On August 3, 2017, defendant Lilly stated during his discussion of companies carried below 80% of costs that "there are five of those accounts I think in the portfolio today. And I think from a prior experience standpoint, we would say the average is probably two of those five in the next same time period two to three, four quarters" would go on nonaccrual.  (Compl. ¶ 101; 2017 Q2 Earnings Call (DE 79-15) at 6).  This was the first time that defendants publicly acknowledged that several 2014 and 2015 investments were likely to go on nonaccrual.  Plaintiffs offer no allegations to argue that this projection by defendant Lilly was a false statement, and in any event, such a forward looking statement about the likelihood of nonaccrual of investments is protected by the bespeaks caution doctrine, since defendant Lilly identified the statement as a projection and cautioned against relying on it.  See 15 U.S.C. § 78u-5(c)(1); (i)(1).  Additionally, this statement was made after the financings that the complaint alleges were fraudulently induced.  (See Compl. ¶¶ 76, 91 (identifying financings in July 2016 and February 2017)).

Although the complaint raises many broad allegations that defendants knew the 2014 and 2015 investment vintages had problems, (see, e.g. id. ¶¶ 74, 79, 84), such allegations fail to provide

_____

[10]Plaintiffs presumably refer to the equity offerings by defendant Triangle in July 2016 and February 2017.  (See Compl. ¶¶ 76, 91).

sufficient particularized facts to plausibly show that defendants were making false statements or omissions with regard to the status of their investments. Absent from the complaint are specific allegations of who knew defendants investments were going to be placed on nonaccrual, when defendants knew such investments would be placed on nonaccrual, and how defendants knew this information. Without such allegations, the court cannot evaluate whether defendants' statements, such as "the pipeline that we have is healthy," were in fact false statements designed to encourage investors to provide debt or equity financing to defendant Triangle. (See, e.g., id. ¶ 78).

Additionally, defendants statements are not made false by the omission of information concerning the state of each of the investments placed on nonaccrual, because defendant Triangle disclosed to its investors on a quarterly basis the cost and fair value status of all the investments eventually placed on nonaccrual status. (See, e.g., id. ¶¶ 30, 31; 2017 Q1 Form 10-Q (DE 79-11) at 3-4; 2015 Form 10-K (DE 78-23) at 40-61). Plaintiffs were made aware at regular intervals how the 2014 and 2015 investments were performing. Therefore, absent additional particularized facts, the court cannot reasonably infer defendants were making false material statements to induce debt and equity financing. Because plaintiffs have failed to plead sufficient facts to show defendants made material false statements or omissions, the court does not reach the issue of whether plaintiffs' complaint adequately alleges scienter.

Based on the foregoing, plaintiffs' complaint is dismissed without prejudice for failure to state a claim. Plaintiff LifeWise is allowed to file a motion to amend, together with proposed second consolidated amended complaint correcting the deficiencies discussed herein, within 21 days from date of entry of this order.

## CONCLUSION

For the foregoing reasons, the court GRANTS defendants' motion to dismiss for failure to state a claim (DE 76). Plaintiffs' complaint is DISMISSED WITHOUT PREJUDICE. Plaintiff LifeWise is ALLOWED to file a motion to amend, together with proposed second consolidated amended complaint correcting the deficiencies discussed herein, within 21 days from date of entry of this order. Should plaintiff LifeWise fail to file an amended complaint by the deadline set herein, the clerk is DIRECTED to close these consolidated cases.

SO ORDERED, this the 7th day of March, 2019.

_____
LOUISE W. FLANAGAN
United States District Judge